UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK HANSEN,<br><br>    Plaintiff,<br><br>  v.<br><br>TICKETMASTER ENTERTAINMENT, INC., et al.,<br><br>    Defendants. | Case No. 20-cv-02685-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 22 |

Plaintiff Derek Hansen has filed a class action against Defendants Ticketmaster Entertainment, Inc. and Live Nation Entertainment Co. Mr. Hansen asserts that Defendants violated the law when Ticketmaster, a division of Live Nation, retroactively changed its refund policy after the coronavirus pandemic. In response to the complaint, Defendants have filed a motion to compel arbitration.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion.

## I.   FACTUAL & PROCEDURAL BACKGROUND

Defendants contend that the parties' dispute must be compelled to arbitration because Mr. Hansen agreed to the Ticketmaster TOU and the TOU contain an arbitration agreement. According to Defendants, Mr. Hansen agreed to the TOU

> at three distinct points: [1] at account creation [on the Ticketmaster website], [2] [at] account sign-in, and [3] [at] ticket purchase. Plaintiff [further] agreed to the [TOU] via a notice at the bottom of virtually every Ticketmaster website page that users navigate in the ticket selection and purchase process, which provides that users

1       agree to the Terms by using the site.

2 Mot. at 3.  For purposes of this order, the Court need only consider the sign-in page.

3       Mr. Hansen purchased the tickets for the two Rage Against the Machine ("Rage") concerts in February 2020.  *See* Moon Decl. ¶ 5.  In order to purchase the tickets, Mr. Hansen had to sign into his Ticketmaster account.

      Defendants have provided evidence about how the sign-in page appeared in February 2020 when Mr. Hansen purchased the tickets.  *See* Tobias Decl. ¶ 7 & Ex. 3 (testifying that "[u]sers of the Ticketmaster website in February 2020 would have seen the same 'Sign In' page as that shown in Exhibit 3).  To sign in, a person would provide certain information (email address and password) and then click a blue button that says "Sign in."  Right above the blue button is the following text (which is in a slightly smaller font size compared to other text): "By continuing past this page, you agree to the Terms of Use and understand that information will be used as described in our Privacy Policy."  The blue font indicated that there was a hyperlink to the TOU.

      The TOU that governed when Mr. Hansen signed in and purchased tickets in February 2020 can be found at Exhibit 12 to the Tobias Declaration.  *See* Tobias Decl. ¶ 13 (testifying that that Exhibit 12 is the current TOU and that the current TOU has been effective since June 2019).

      The first page of the TOU has two bolded headers that precede the Table of Contents.  The second bolded header and the text underneath it provide as follows:

> **NOTICE REGARDING ARBITRATION AND CLASS ACTION WAIVER:**
>
> These terms contain an arbitration agreement and class action waiver, whereby you agree that any dispute or claim relating in any way to your use of the Site, or to products or services sold, distributed, issued, or serviced by us or through us will be resolved by binding, individual arbitration, rather than in court, and you waive your right to participate in a class action lawsuit or class-wide arbitration.  We explain this agreement and waiver, along with some limited exceptions, in Section 17, below.

Tobias Decl., Ex. 12 (TOU at 1).

      Section 17 in turn contains, *inter alia*, the following provisions:

> The arbitration agreement in these Terms is governed by the Federal Arbitration Act (FAA), including its procedural provisions, in all respects.  This means that the FAA governs, among other things, the

> interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver discussed below. State arbitration laws do not govern in any respect.
>
> . . . . The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including but not limited to, any claim that all or any part of this Agreement is void or voidable.

Tobias Decl., Ex. 12 (TOU § 17).

## II. DISCUSSION

### A. Legal Standard

Defendants argue that the FAA governs the arbitration agreement in the instant case given the express terms of the agreement, as quoted above. Mr. Hansen does not expressly disagree but contends that the provisions of the FAA are largely beside the point because the question here is whether an agreement to arbitrate was ever formed in the first instance. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991) ("[A] party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the existence of an agreement to arbitrate. Only a court can make that decision."); *see also Sanford v. Member Works, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007) ("[W]hen one party disputes 'the making of the arbitration agreement,' the Federal Arbitration Act requires that 'the court [] proceed summarily to the trial thereof' before compelling arbitration under the agreement.") (quoting 9 U.S.C. § 4).

According to Mr. Hansen, there was no contract formation because he did not have actual knowledge of the arbitration agreement, *see* Hansen Decl. ¶¶ 2, 6 (testifying that "I have never reviewed the Terms of Use on Defendants' website" and that, "[u]ntil this case was filed, I was unaware that the Terms of Use on Defendants' website included an arbitration provision purporting to waive my rights"), and constructive knowledge cannot reasonably be inferred.

The Ninth Circuit has directed that, "in determining whether a valid arbitration agreement exists, [a court] 'appl[ies] ordinary state-law principles that govern the formation of contracts.' Federal courts sitting in diversity look to the law of the forum state – here, California – when

3

1 making choice of law determinations." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th

2 Cir. 2014). "In California, '[g]enerally speaking the forum will apply its own rule of decision

3 unless a party litigant timely invokes the law of a foreign state.'" *Peter v. DoorDash, Inc.*, No.

4 19-cv-06098-JST, 2020 U.S. Dist. LEXIS 73984, at *8 (N.D. Cal. Apr. 23, 2020). In the instant

5 case, Mr. Hansen assumes that California law applies, *see* Opp'n at 5 (citing California authority),

6 and Defendants do not appear to argue that any other law applies. Therefore, the Court applies

7 California law. Under California law, contract formation requires a manifestation of mutual

8 assent. *See Peter*, 2020 U.S. Dist. LEXIS 73984, at *9. More specifically, "[u]nder California

9 law, '[c]ourts must determine whether the outward manifestations of consent would lead a

10 reasonable person to believe the offeree has assented to the agreement.'" *Lee v. Ticketmaster

11 L.L.C.*, 817 F. App'x 393, 394 (9th Cir. 2020) (quoting *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d

12 559, 565 (9th Cir. 2014)).

13 Both parties agree that the Ninth Circuit's decision in *Nguyen* provides importance

14 guidance regarding manifestation of mutual assent. *See Nguyen*, 763 F.3d at 1175 (applying New

15 York law "to the extent possible" but noting that there would be no difference under California

16 law). In *Nguyen*, the Ninth Circuit made a distinction between two kinds of Internet contracts: (1)

17 clickwrap (or click-through) agreements "in which website users are required to click on an 'I

18 agree' box after being presented with a list of terms and conditions of use" and (2) browsewrap

19 agreements "where a website's terms and conditions of use are generally posted on the website via

20 a hyperlink at the bottom of the screen" – *i.e.*, a user does not expressly manifest agreement to the

21 terms and conditions but instead gives assent simply by using the website. *Id.* at 1175-76.

> "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions."
>
> . . . Courts have . . . been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement – that is, where the user is required to affirmatively acknowledge the agreement before proceeding with

4

use of the website.

*Id.* at 1176.

B.    Sign-In Page

As indicated above, the critical issue in the instant case is whether Mr. Hansen had constructive knowledge of the arbitration agreement – or rather, of the TOU which contain the arbitration agreement. As to whether Mr. Hansen had constructive knowledge of the TOU, the Court must consider how the Ticketmaster sign-in page, which made reference to the TOU, appeared to Mr. Hansen.

As noted above, Ticketmaster has provided evidence that, during the relevant period, a customer would sign into a Ticketmaster account by providing certain information (email address and password) and then clicking a blue button that says "Sign in." Right above the blue button is the following text (which is in a slightly smaller font size compared to other text): "By continuing past this page, you agree to the Terms of Use and understand that information will be used as described in our Privacy Policy." The blue font indicated that there was a hyperlink to the TOU. The sign-in page had a graphic with text at the lefthand side; however, the sign-in box itself was still prominently displayed. The parties agree that the sign-in page thus presented neither a browsewrap agreement nor a clickwrap agreement, but rather something in between – what is sometimes characterized as a modified clickwrap agreements.

Ticketmaster's sign-in page has been challenged but approved by the Ninth Circuit. More specifically, in *Lee v. Ticketmaster L.L.C.*, No. 18-cv-05987-VC (N.D. Cal.), the plaintiff purchased tickets on the Ticketmaster website for sporting events held in 2016 and 2018. *See Lee*, No. 18-cv-05987 (N.D. Cal.) (Docket No. 1) (Compl. ¶ 7). The defendants moved to compel arbitration and, in support of contract formation, provided evidence of the sign-in page as it existed in November 2018. *See Lee*, No. 18-cv-05987 (N.D. Cal.) (Docket No. 26) (Tobias Decl., Exs. F); *see also* Reply at 6-7 (providing screenshot of sign-in page in *Lee* and screenshot of sign-in page in the instant case; citing O'Mara Reply Declaration). The sign-in page in November 2018 is very similar – in terms of language as well as look and feel – to the sign-in page at issue here (*i.e.*, from February 2020). Judge Chhabria granted the defendants' motion to compel

5

1    arbitration in April 2019, and, in June 2020, the Ninth Circuit affirmed.

2            The Ninth Circuit noted first that the Ticketmaster TOU were neither a browsewrap

3    agreement ("because they are not merely posted on Ticketmaster's website at the bottom of the

4    screen") nor a "pure" clickwrap agreement ("because Ticketmaster does not require users to click

5    a separate box indicating that they agree to its Terms"). *Lee*, 817 Fed. Appx. at 394. But

6    whatever category the TOU fell into, the court held that "Ticketmaster's website provided

7    sufficient notice for constructive assent, and therefore, there was a binding arbitration agreement

8    between Lee and Ticketmaster." *Id.*

> "Lee validly assented to Ticketmaster's Terms of Use, including the arbitration provision, each time he clicked the "Sign In" button when signing into his Ticketmaster account, where three lines below the button, the website displayed the phrase, "By continuing past this page, you agree to our Terms of Use," as well as each time he clicked the "Place Order" button when placing an order for tickets, where directly above the button, the website displayed the phrase, "By clicking 'Place Order,' you agree to our Terms of Use," where in both contexts, "Terms of Use" was displayed in blue font and contained a hyperlink to Ticketmaster's Terms. Thus, Ticketmaster's website required users to "affirmatively acknowledge the agreement before proceeding," and "the website contain[ed] an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." Lee "cannot avoid the terms of [the] contract on the ground that he . . . failed to read it before signing," especially when he "had a legitimate opportunity to review it."

*Id.* at 394-95.

19            Several months after *Lee*, the Ninth Circuit issued a decision in *Dohrmann v. Intuit, Inc.*,

20   823 Fed. Appx. 482 (9th Cir. 2020), where it again found contract formation based on a sign-in

21   page.

> During the relevant timeframe, a user accessing a TurboTax account, after entering a user ID and password, was required to click a "Sign In" button, directly under which the following language appeared: "By clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use, and have read and acknowledged our Privacy Statement." The terms "Turbo Terms of Use," "TurboTax Terms of Use" and "Privacy Statements" were each light blue hyperlinks which, if clicked, directed the user to a new webpage. A user clicking on the hyperlink "TurboTax Terms of Use" was directed to a copy of the "Intuit Terms of Service for TurboTax Online Tax Preparation Services," which contained the arbitration clause.

6

1   *Id.* at 484.  The Ninth Circuit stated: "The relevant warning language and hyperlink to the Terms
2   of Use were conspicuous – they were the only text on the webpage in italics, were located directly
3   below the sign-in button, and the sign-in page was relatively uncluttered." *Id.*
4         In light of *Lee* and *Dohrmann*, Mr. Hansen's position lacks merit.

- The sign-in page at issue was relatively uncluttered.  Although there was a graphic with text, that was set to the side so that the sign-in box itself was prominently featured.
- In the sign-in box, the following text was right above the blue "Sign in" button: "By continuing past this page, you agree to the Terms of Use and understand that information will be used as described in our Privacy Policy."  The proximity of the text to the "Sign in" button makes the text conspicuous.  Mr. Hansen criticizes the text for being smaller than other text and for being grey in color.  But the text is not markedly smaller than the other text, and the grey is in sufficient contrast to the background which is white.  Moreover, the phrase "Terms of Use" appears in blue font so that there is even more contrast.  Although Mr. Hansen protests that the use of blue font was not sufficient – *e.g.*, "Terms of Use" should have been underlined as well – that argument is not overly compelling.  Although Judge Orrick has suggested that "the mere change in color of the hyperlinks, without more, is enough" – in other cases, "the hyperlinks are also underlined, highlighted, in all caps, or in a box" – he ultimately found a sign-in page inadequate for other reasons: "[A]s plaintiffs note, the *other* hyperlink on the page is formatted differently.  The hyperlink to the password recovery page *is* bolded, underlined, and appears to be in a larger font size than the hyperlink at issue." *Colgate v. Juul Labs., Inc.*, 402 F. Supp. 3d 728, 765-66 (N.D. Cal. 2019) (Orrick, J.).

Nowhere in the opposition does Mr. Hansen expressly address *Lee* – or for that matter, *Dohrmann*.  Instead, he highlights that the actual number of people who clicked on "Terms of Use" is very small – less than 1 percent.  But, under the circumstances, that fact does not weigh very heavily in supporting Mr. Hansen's position that the text above with the hyperlink to the

7

TOU was not conspicuous.  Indeed, in *Lee*, the Ninth Circuit underscored that the plaintiff "'cannot avoid the terms of [the] contract on the ground that he . . . failed to read it before signing,' especially when he 'had a legitimate opportunity to review it.'"  *Lee*, 817 Fed. Appx. at 394.  Moreover, in *Dohrmann*, the Ninth Circuit reversed the lower court decision that had denied the motion to compel arbitration and that had noted, *inter alia*, the relevance of click data.  *See Arena v. Intuit Inc.*, 444 F. Supp. 3d 1086, 1093 (N.D. Cal. 2020) ("find[ing] it relevant that less than 0.55% of users logging into TurboTax's website between January 1 and April 30, 2019, actually clicked on the hyperlink to the Terms" because "[t]he fact that so few users actually clicked on the hyperlink supports the inference that many of them did not notice it").

At the hearing on the motion to compel arbitration, Mr. Hansen expressly addressed *Lee* for the first time.  The arguments that he presented were not convincing.  First, Mr. Hansen noted that the sign-in page in the instant case does not state that, "by clicking on the Sign In button," the customer agrees to the TOU, but instead says that, "by continuing past this page," the customer accepts the TOU.  According to Mr. Hansen, the sign-in page at issue in *Lee* is distinguishable because it did not specify that a customer agrees to a TOU "by continuing past this page."  As a factual matter, he is incorrect.  That phrase "by continuing past this page") was used both in *Lee* and in the instant case.  Second, there is no material difference between "by clicking on the Sign In button" and "by continuing past this page," as Mr. Hansen posits.  It is obvious that one who wants to purchase tickets may not advance "past this page" unless the customer clicks the sign-in button.  Mr. Hansen's contention that, under the terms of the sign-in page, a customer could agree to the TOU simply by clicking on the TOU or going to a different part of the website lacks merit.  Such a detour would not take the customer past the sign-in page necessary in order to make the purchase.

Accordingly, the Court concludes, as in *Lee*, that Mr. Hansen validly assented to the Ticketmaster TOU when he clicked the Sign In button, as required before he could move on to purchase tickets for the Rage concerts.  By assenting to the TOU, Mr. Hansen also assented to the arbitration agreement contained therein.  Mr. Hansen has not made any other argument as to why he should not be compelled to arbitration, consistent with the arbitration agreement.  Therefore,

Defendants' motion to compel arbitration is granted.

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion and stays proceedings pending resolution of the arbitration.

This order disposes of Docket No. 22.

**IT IS SO ORDERED**.

Dated: December 11, 2020

_____
EDWARD M. CHEN
United States District Judge